IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RESIDENTS AGAINST FLOODING; | § | |
| ANITA GIEZENTANNER; VIRGINIA | § | |
| GREGORY; LEE MARTIN; LOIS MEYERS; | § | |
| AND BAYAN RAJI, | § | |
| *Plaintiffs,* | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:16-cv-01458 |
| REINVESTMENT ZONE NUMBER | § | |
| SEVENTEEN, CITY OF HOUSTON, TEXAS | § | |
| (TIRZ 17); MEMORIAL CITY | § | |
| REDEVELOPMENT AUTHORITY (AKA | § | |
| TIRZ 17 REDEVELOPMENT AUTHORITY); | § | |
| AND THE CITY OF HOUSTON, TEXAS, | § | |
| *Defendants.* | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.      INTRODUCTION

1.      Many Houston residents live in fear of rain. Their homes have flooded so dramatically that each rain shower prompts visceral alarm. If they are away from their home during rain events, all they think about is returning, to save what they can from floodwaters.

2.      Plaintiffs bring this case to enjoin arbitrary governmental action which benefited, and continues to benefit, private commercial interests and developers within Reinvestment Zone Number Seventeen, City of Houston, Texas ("TIRZ 17"), at the expense of significant harm and loss to hundreds of residential homes in the nearby Memorial City neighborhoods.

3.      Since the inception of TIRZ 17 in 1999, the Defendants City of Houston ("City") and the Memorial City Redevelopment Authority, also known as the TIRZ 17 Redevelopment Authority ("the Authority"), have engaged in a pattern of: (1) implementing drainage and mobility infrastructure projects in and around TIRZ 17 that efficiently convey stormwater out of

the TIRZ 17 commercial areas and into the surrounding residential neighborhoods or into their overstrained storm systems; (2) approving private commercial development within TIRZ 17 that elevated the properties, without any or without sufficient stormwater mitigation, causing more stormwater to enter the neighborhoods; and (3) postponing infrastructure projects to help the residential neighborhoods, often in favor of non-essential projects that benefit private commercial interests.

4.      As a result, hundreds of homes in the Memorial City area have suffered repeated and horrific flooding.

5.      The purpose of a TIRZ is to aid, assist and act on behalf of the City of Houston in the performance of the City's governmental and proprietary functions with respect to the public's common good and general welfare.

6.      MetroNational Corporation—a private commercial development corporation— conceived of and undertook the administrative work to create TIRZ 17. In fact, during its creation, attorneys working for MetroNational referred to it as "MetroNational's TIRZ."

7.      Whatever "blight" and drainage problem might have existed within TIRZ 17 sufficient for its creation under Chapter 311 of the Texas Tax Code, that blight has been directly transferred to the nearby residential areas.

8.      While TIRZ 17 projects and commercial development were ongoing, Defendants took no action, or grossly insufficient action, to similarly improve drainage for the residential areas before sending stormwater into them and into the outdated stormwater systems that could not handle the increased flows.

9.      The Defendants' actions and inactions were undertaken with knowledge of their consequences.

10.     The Defendants had actual notice of the need to address drainage problems for the nearby residential neighborhoods. Multiple studies conducted by the City of Houston, the Authority, the TIRZ, and others put the Defendants on notice regarding the desperate need for drainage improvements in the neighborhoods adjacent to TIRZ 17.

11.     Moreover, for years, concerned citizens have repeatedly complained to the City and to the TIRZ 17 Board that they were experiencing flooding problems as a result of infrastructure projects and private commercial development within the TIRZ.

12.     The neighborhoods repeatedly alerted the Houston City Council, its Planning Commission, and its Flood and Drainage Committee regarding these flooding issues, but their advocacy did not result in relief, and flooding has reoccurred.

13.     As a result, not only have Plaintiffs and many other RAF members and supporters suffered thousands of dollars in property losses, these residential homeowners feel unsafe in their own homes. They live in fear of each and every rainstorm.

14.     For many of the homeowners, the "Memorial Day" (May 25–26, 2015) and "Tax Day" (April 18, 2016) floods were debilitating blows; they no longer have faith in advocating to the Defendants, and litigation is now the only path forward to seek relief.

15.     Defendants know solutions: in 2003, the engineering firm Walter P. Moore prepared a study for the City recommending detention ponds as regional drainage solution.

16.     Also in 2003, the City, the Authority and TIRZ 17 signed a contract promising the construction of five new detention structures similar to those recommended in the Walter P. Moore Study.

17.     However, to date, only one detention basin was constructed to offset the tremendous commercial development and infrastructure projects within TIRZ 17 that are

impacting the residential neighborhoods. Tens of millions of dollars have been expended for other TIRZ 17 projects, but they have not been expended for detention to offset the stormwater runoff overflowing in the residential areas.

18.     Further, not only have the Defendants failed to prioritize relief for residential areas over the last ten years, they have allocated and continue to allocate funds for various nonessential projects—such as landscaping an old existing detention pond at the behest of, and to the benefit of, a MetroNational subsidiary.

19.     As described more fully below, governmental power is being used arbitrarily.

20.     The Defendants' actions and inactions—knowingly sending stormwaters into the residential neighborhoods that lack adequate infrastructure, without mitigation or necessary infrastructure improvement, and favoring projects for the private commercial interests at great expense to the residential interests—should shock our collective conscience.

21.     Governmental power has been used to create a dangerous environment for the residents and their property.

22.     Governmental power is being used to seize Plaintiffs' real property.

23.     These abuses of governmental power are violations of the Texas and United States Constitutions for which relief is sought.

24.     In this lawsuit, Plaintiffs seek declaratory and injunctive relief: to require the immediate prioritization of flood relief projects for neighborhoods; to enjoin the Defendants from using TIRZ 17 funds for private development agreements; to enjoin the City from approving new commercial building permits on large lots within TIRZ 17 until a finding is made that the development does not increase flooding risks in the residential neighborhoods; and to appoint a Special Master that will oversee expenditure of TIRZ 17 funds and oversee projects

designed to alleviate flooding in the nearby residential areas.

## II.      JURISDICTION AND VENUE

25.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

26.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

27.      This action arises under the U.S. Const., amend. IV and XIV, and 42 U.S.C. § 1983.

28.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claim arose in the district, and the property that is the subject of the action is situated in the district.

## III.      PARTIES

29.      Plaintiff Residents Against Flooding ("RAF") is a non-profit organization located at P.O. Box 430574, Houston, Texas 77243-0574, and is suing on behalf of its members.

30.      Plaintiff Lois Meyers is a member and supporter of RAF and lives north of I-10 on Westview.

31.      Plaintiff Virginia Gregory is a member and supporter of RAF and lives north of I-10 on Westview.

32.      Plaintiff Bayan Raji lives north of I-10 on Cedardale Street.

33.      Plaintiff Lee Martin lives south of I-10 on Cobblestone in the Frostwood subdivision.

34.      Plaintiff Anita Giezentanner lives south of I-10 on Tallowood.

35.      All Plaintiffs reside in Harris County, Texas.

36.      Defendant the City of Houston, Texas is a municipal corporation, chartered under a Special Act of the Legislature of the State of Texas, and may be served by serving Mayor

Sylvester Turner at City Hall, located at 901 Bagby, 3rd Floor, Houston, Texas 77002.

37.     Defendant Memorial City Redevelopment Authority, aka TIRZ 17 Redevelopment Authority, is a local government corporation, with Ms. Ann Givens as the current board chair, and may be served to the registered agent Don Huml at 8955 Katy Freeway, Suite 215, Houston, Texas 77024.

38.     Defendant Reinvestment Zone Number Seventeen, City of Houston, Texas does not have a registered agent and may be served to the chair of the Board, Ms. Ann Givens, at 8955 Katy Freeway, Suite 215, Houston, Texas 77024.

## IV.     FACTS

### FOLLOWING ITS CONCEPTION BY METRONATIONAL, THE CITY OF HOUSTON ESTABLISHED TIRZ 17 IN 1999.

39.     In the fall of 1998, MetroNational hired a team of attorneys to work on the creation of TIRZ 17. MetroNational or its subsidiaries own a large number of properties within the soon-to-be-formed TIRZ.

40.     The City of Houston created TIRZ 17 on July 21, 1999, through the passage of Ordinance No. 1999-759. This ordinance designated the geographic area now known as TIRZ 17 as a tax increment reinvestment zone pursuant to Chapter 311 of the Texas Tax Code.

41.     In theory, TIRZ 17 could only be formed due to the area being a "menace to the public health, safety, morals, or welfare in its present condition." TEX. TAX CODE § 311.005. TIRZ 17 could only be formed upon the City's finding that "improvements in the zone . . . will be of general benefit to the municipality." TEX. TAX CODE § 311.004.

42.     The City of Houston created the Memorial City Redevelopment Authority by Resolution No. 2002-26 adopted on August 14, 2002.

43.     The City approved the first TIRZ 17 project plan with Ordinance No. 1999-852,

6.

and twice amended the TIRZ by Ordinance Nos. 2011-728 and 2014-1130.

44.    Initially, the City mandated that TIRZ 17 could only undertake projects related to mobility and drainage, in order to remedy the "blight" conditions identified in the area related to these specific purposes. The first project plan recognized that mobility improvements were necessary "to mitigate the impact of commercial activities on adjacent residential areas and help conserve and preserve those neighborhoods."

45.     Much later, the City approved the addition of two more project purposes, related to increased parks and greenspace and pedestrian improvements, for TIRZ projects.

46.    TIRZ 17 now includes roughly 1,000 acres along I-10 from Bunker Hill to Beltway 8.

47.    The purpose of TIRZ 17 is to "aid, assist and act on behalf of the City of Houston in the performance of the City's governmental and proprietary functions with respect to the common good and general welfare of the Memorial City Area." Ordinance 2002-26.

48.    According to the current finance plan, TIRZ 17 will have received more than $300 million of public tax monies by 2029. However, the tax base of the TIRZ is increasing much faster than predicted, so the incremental tax also increases, and the eventual total will likely greatly exceed $300 million.

49.    The City Council currently appoints all the Board members of the TIRZ and the Authority, and the same members are appointed to serve on both boards simultaneously.

50.    "TIRZ 17" and "the Authority" are used interchangeably throughout this Complaint because, for practical purposes, they function in parallel as a single decision-making body.

51.    Since its inception in 1999, the vast majority of Board Members have been

representatives affiliated with MetroNational, other commercial developers, business owners, and engineers, all of whom have significant property or business interests inside the TIRZ.

52.     The City maintains oversight over the TIRZ, including statutory authority to "cause project plans to be prepared, approve and implement the plans" and to designate the termination date of the TIRZ by Ordinance or order.  TEX. TAX CODE §§ 311.008; 311.017.

53.     In short, the Authority and TIRZ Boards recommend projects, but the City Council has final approval.

54.     Due to the existence of TIRZ 17 and the Authority, the City no longer undertakes its own drainage improvements inside the TIRZ or in the nearby residential areas.

## DRAINAGE IN THE MEMORIAL CITY AREA FLOWS INTO BUFFALO BAYOU, A HEAVILY STRAINED SYTEM.

55.     The region being referred to herein as the Memorial City Area encompasses generally the neighborhoods north and south of IH-10 and between Beltway 8 and Blalock Rd.

56.     This area primarily started developing in the 1950s and 1960s.

57.     Essentially, all rainfall in TIRZ 17 and the adjacent neighborhoods eventually drains from north to south into Buffalo Bayou, but through different sub-watersheds and different conveyance systems.

58.     There are three main sub-watersheds in the TIRZ 17 area: the eastern two-thirds drains into Stoney Creek, W-151-00-00; the area south of I-10 between Gessner and Attingham drains to Woodland Hollow Creek, W-153-00-00; and the area north of I-10 generally drains into Briar Branch Creek, W-140-01-00. A small western portion of TIRZ 17 is in the Rummel Creek watershed, W-156-00-00.

59.     Stoney Creek (W-151) runs underground from north of I-10 (at Witte Rd.) directly south passing under I-10, through TIRZ 17 under Memorial City Mall near Strey Lane,

and then becomes an open ditch through the neighborhoods south of Barryknoll along the western border of the City of Bunker Hill Village. Stoney Creek receives runoff from the north side, I-10, the TIRZ and the south-side neighborhoods.

60.     Woodland Hollow Creek (W-153) is a short natural creek starting in the middle of the south-side neighborhoods at Benignus, and flowing south through the Woodland Hollow subdivision before crossing under Memorial Drive and then traveling in underground culverts for 1200 feet before connecting with Buffalo Bayou.

61.     Briar Branch (W-140-01) is north of I-10, starting at Gessner, running along the northern boundary of the TIRZ, and conveys water eastwards and parallel to I-10, eventually connecting to Spring Branch Creek and then into Buffalo Bayou. Briar Branch from Gessner to Bunker Hill is mostly an unimproved grassy swale or ditch that receives runoff from commercial properties in the TIRZ and from the north-side neighborhoods.

62.     The bayous and creeks are regulated and maintained by Harris County Flood Control District ("HCFCD").

63.     HCFCD has determined that Buffalo Bayou is at full capacity, and therefore no drainage project is allowed to increase flows into Buffalo Bayou without mitigation.

64.     Mitigation may be in the form of "detention" whereby large basins or underground structures are constructed, and stormwater is conveyed into them and temporarily held there during large rain events. That water is designed to be detained for a period of time and more slowly released downstream so that Buffalo Bayou can accept the additional flows without flooding.

65.     In some cases, chokepoints or restrictors are used to prevent increased flows into Buffalo Bayou. If stormwater is increased and reaches these restrictors, the waters can back up

and rise within neighborhoods. For example, there are various chokepoints in the vicinity of channel W-153.

**THE FLOODING DANGERS IN THIS AREA ARE DOCUMENTED IN MULTIPLE STUDIES KNOWN TO, AND, IN SOME CASES, COMMISSIONED BY THE DEFENDANTS.**

66.     Multiple studies, including studies commissioned by Defendants, extensively document that the Memorial City Area, including the surrounding residential neighborhoods, is susceptible to flooding, has outdated or insufficient storm sewers, and requires improved flood protection. Some examples are given here. This list is not exhaustive.

67.     Among the key studies was one conducted by Walter P. Moore, and prepared for the City of Houston in 2003. It had a stated goal of developing ideas for potential improvements that could be provided by the TIRZ to improve drainage in the district and surrounding areas.

68.     The Walter P. Moore Study acknowledged that the area around TIRZ 17 has developed under outdated design criteria resulting in undersized storm sewers. Several neighborhoods outside of the TIRZ 17 area were identified as most impacted by inadequate drainage, including: Memorial Forest, Memorial Woods, Frostwood, and Fonn Villas.

69.     The Walter P. Moore Study recommended constructing detention ponds. It identified that "in order to improve drainage conditions, detentions ponds must be developed to store excess stormwater runoff."

70.     In 2004, Klotz Associates prepared a Drainage and Flood Control Study. The study focused on problems in the W-151 vicinity and stated that "a regional solution is needed to address the drainage and flooding issues facing the W-151 Study Area."

71.     In 2006, LAN Engineering conducted a study showing where six detention basins could be placed to address flooding issues.

72.     In 2008, Omega Engineers conducted a study and found that the Frostwood subdivision had street and house flooding problems due to stormwaters overflowing from other nearby areas and overwhelming Frostwood's drainage system. The study stated: "Based on the information we have obtained it appears that water from outside the designed drainage area is entering the subdivision, via overland flow. The overland flow is entering the subdivision from the north along Frostwood and from Gessner Road to the east along Perthshire, Broken Arrow and Old Oaks."

73.     In 2009, HCFCD prepared a flood study documenting extensive structural and street flooding within the W151 watershed south of IH-10.

74.     In 2012, LAN prepared a Regional Drainage Study for TIRZ 17. The study evaluated existing conditions of the area within the TIRZ and large areas of the neighborhoods outside the TIRZ to the north and south in order to assess regional flooding problems and identify potential solutions.

75.     The 2012 LAN Regional Drainage Study recognized the inadequacy of the existing drainage systems. The Study divided the greater area into ten regions, proposed several projects in areas to solve the specific problems, and ranked the projects by cost and feasibility. LAN's proposed solutions included additional detention.

76.     The 2012 LAN Regional Drainage Study documented and provided maps of the areas, including Plaintiffs' homes, that were prone to flooding and would in fact flood during certain rain events. Defendants knew, well before the 2015 and 2016 floods, who would flood.

77.     In 2014, Klotz conducted an independent review on the 2012 LAN study. The Klotz review noted that between 180 and 240 acre-feet of additional detention was needed, and that available detention sites needed to be identified and accurate cost estimates developed.

78.     In 2014, LAN prepared an updated Regional Drainage Study. This update proposed several solutions to the flooding in the south-side neighborhoods, including an extensive system of large box culverts for inline detention, combined with a new detention basin south of I-10. Among other issues, the update showed overland sheet flow from the Memorial City Hospital-Mall complex surging through Memorial Hollow into Frostwood.

79.     This study confirmed that for a total cost of between $68 and $82 million, the proposed drainage improvements would eliminate flooding in up to 924 structures and homes, even in a 100-year rainfall.

80.     In addition to the multiple studies, Defendants are in possession of a sophisticated hydrological model designed to predict flooding of homes in the neighborhoods. Defendants commissioned LAN to develop a stormwater flooding model of the area relying on LIDAR elevation data and drainage infrastructure. The InfoWorks modeling software predicts the depth of flooding at a particular location. New drainage infrastructure can be added to the model to predict whether it will increase or decrease flood elevations at any location. Defendants have used this modeling software to assess flooding in the residential areas surrounding TIRZ 17.

81.     In short, the Defendants know and understand that they cannot approve or complete projects (*i.e.*, building or infrastructure projects) that contribute excess stormwater into the residential neighborhoods or into the storm sewer systems of these neighborhoods without contemporaneous infrastructure improvements in the neighborhoods or additional flood protection (*e.g.*, detention ponds) in or "upstream" of these neighborhoods.

**DESPITE KNOWLEDGE OF FLOODING RISKS, INFRASTRUCTURE PROJECTS BY DEFENDANTS MOVE WATER INTO THE RESIDENTIAL NEIGHBORHOODS.**

82.     While these studies were ongoing, and even after many of these studies had been completed, Defendants approved and constructed infrastructure projects that efficiently move

stormwater out of TIRZ 17 and into the surrounding neighborhoods, or into storm sewer systems of the residential neighborhoods that could not handle the additional waters.

83.   The purpose of the infrastructure projects was to improve the "blight" in the TIRZ 17 area.

84.   The Defendants' infrastructure projects included both drainage and mobility projects. With regard to mobility projects, Houston's streets are a secondary drainage system of the City. Thus, when the slope of a road is changed, or the road is re-profiled, it can be like re-directing a river.

85.   In 2007, Defendants widened and lowered Bunker Hill Road north of I-10, and replaced storm sewers. Following this project, stormwater that used to pond only in the neighborhoods on the west side of Bunker Hill now flows across the road to flood the eastside neighborhoods as well.

86.   The lowering and widening of Bunker Hill changed the drainage pattern. Since the changes, the neighborhoods both east and west of the road flooded badly in 2009, 2015 and 2016, including Plaintiffs' homes.

87.   As part of this project, Defendants rebuilt the Bunker Hill bridge over the W-140 channel. The old bridge spanned the full channel width and did not restrict flows in any way. The new bridge now restricts flow through two small 7-foot box culverts, with the rest of the channel cross section completely blocked by the solid concrete bridge.

88.   As a result of the restriction at the Bunker Hill bridge, if anything more than a 7-year storm takes place, then water backs up upstream of the bridge, causing flooding of the northwest neighborhoods, including Plaintiffs' homes.

89.   The commercial developments in the TIRZ nearby Bunker Hill, such as the

13.

Fidelis or HEB property, are all newly elevated, minimizing their own flood risks but displacing this water into the W-140 channel and into the neighborhoods.

90.     As an example of a drainage project in the area, in 2008, Hurricane Ike caused flooding at the Trammel Crow apartments on Bunker Hill, an apartment complex within TIRZ 17. TIRZ 17 immediately approved construction of a 42-inch storm drain on Pine Lake Drive in front of the complex and south on Bunker Hill to direct water flow. The pipe runs into the side of the Bunker Hill bridge culvert. The apartment complex has not flooded since.

91.     The project to improve the flooding of the Trammel Crow complex contributed to the waters backing up in the residential neighborhoods outside TIRZ 17.

92.     South of I-10, Defendants made changes to the road and storm sewers along South Gessner Drive to improve the TIRZ mobility and drainage. Gessner was widened from six lanes to eight and box culverts were installed. The changes to South Gessner contribute to flooding in the neighborhoods to the south.

93.     These and other infrastructure projects by Defendants have reduced or eliminated ponding of water on the private commercial properties in and near TIRZ 17, and along the roadways that their customers use. They send water into the residential areas with inadequate stormwater systems. Defendants' projects caused the efficient conveyance of stormwater out of the TIRZ areas, where it used to pond, and into downstream areas.

94.     Defendants know that water which no longer floods TIRZ 17 properties has to go somewhere, and when it no longer stays in the TIRZ, it is conveyed to residential neighborhoods which do not have the capacity to handle the additional floodwaters.

95.     Around 2010, the City made changes to the Fonn Villas storm sewers along Attingham drive in the W-153 sub-watershed.

96.     Despite residents' complaints, the project went forward, causing flooding by further overloading the W-153 channel and flooding nearby neighborhoods.

97.     These and other infrastructure projects contributed to the subsequent flooding of Plaintiffs' properties.

98.     Restrictors left in neighborhood storm sewer systems create impediments to drainage to Buffalo Bayou and cause the backup of water in the neighborhoods when stormwaters flow out of the TIRZ and into the neighborhoods.

99.     Residents are concerned that future planned infrastructure projects will similarly convey stormwater out of the TIRZ, into the neighborhoods, and worsen the flooding.

**AT THE SAME TIME, THE CITY DID NOT REQUIRE ADEQUATE MITIGATION FOR COMMERCIAL DEVELOPMENT WITHIN TIRZ 17—RESULTING IN MORE STORMWATER TO RESIDENTIAL AREAS.**

100.    There has been dramatic commercial development within TIRZ 17 since its formation in 1999, and the tax base has increased from half a billion dollars to over $2.7 billion.

101.    The City approved this commercial development.

102.    Without any or without sufficient mitigation, the City has permitted private commercial developers to elevate and improve drainage on their lots.

103.    The result is that commercial lots which used to flood do not flood anymore.

104.    Almost all the new commercial developments and redevelopments in the TIRZ are allowed to bring in fill material to elevate the entire site, sometimes by as much as two feet. This fill blocks the overland movement of stormwater, and causes the displacement of stormwater, which must go somewhere else. Because all commercial properties are similarly elevated, the water is displaced to City streets and storm sewers, where it is conveyed along the secondary drainage arteries into the neighborhoods or into overstrained stormwater channels and

backs up into or otherwise floods the neighborhoods.

105.    For example, the City approved construction of a shopping center on an approximately forty-four acre site owned by another commercial development corporation, Fidelis, at Bunker Hill and I-10. During development, Fidelis raised the site one to two feet, and the City required no mitigation for the elevated lot.

106.    The forty-four acre Fidelis property effectively used to serve as detention with trees, pervious areas, and low spots. Before redevelopment, significant volumes of water would pond during rains on this property. The property used to be lower than the adjacent road.

107.    Today, the displaced water from this large property travels to the neighborhoods either as overland sheet flow, through the streets, or via the storm sewers than cannot handle the excess water, backing up in the neighborhoods.

108.    Plaintiffs have identified at least seven large commercial properties at which an estimated 140 acres were filled and elevated between eighteen and twenty-four inches. In an eight-inch rain event, approximately a hundred acre-feet of stormwater is displaced to overwhelm storm sewers, overflow the banks of open channels, and flood neighborhoods.

109.    The City allowed the properties to be elevated, with no detention or insufficient detention to mitigate for the increased runoff or displaced water.

110.    The reason commercial developers are bringing in fill to elevate their properties is because they know the properties flood (or may be susceptible to flooding). Thus, the developers are filling in an area that already floods without mitigating, and the displaced water is going into the neighborhoods.

111.    Again, Defendants know that water which no longer remains on, or ponds on, TIRZ 17 properties has to go somewhere, and when it no longer stays in the TIRZ, it is conveyed

to residential neighborhoods which do not have the capacity to handle the additional flood waters.

112.   Due to these projects, even more stormwater moves out of the commercial areas and into residential areas. Plaintiffs fear this pattern (the City approving commercial development that increases floodwaters into their homes) will continue in the future.

113.   The City's failures to require mitigation for the new stormwater displaced by commercial development in the TIRZ shifts the flooding costs and burden to the residential areas.

114.   The City of Houston appears willfully blind about flooding issues caused by the unmitigated elevation of these commercial properties, and should be better regulating this problem.

115.   The City of Houston is aware that certain areas that are not mapped in the floodplain are likely, in fact, located in a floodplain. When the City allows properties in a floodplain to be elevated, then the displaced water must go elsewhere, and the flooding problem is simply moved to other victims.

116.   The City could make a determination about the floodplain and regulate development accordingly. The City appears to be ignoring areas known to be in 100-year floodplains. The area near W-140 is an example.

117.   The City of Houston is a community participating in the Federal Flood Insurance program and as such is subject to federal statutory regulation under 42 U.S.C. § 4001 *et seq.* and federal regulations enacted under the authority of those statutes. Under 44 C.F.R. Part 65, communities have obligations to assist FEMA's efforts in providing up-to-date information on special flood and flood-related erosion hazards. On information and belief, the City has not

fulfilled its obligations to provide FEMA with updated information pursuant to federal regulations.

118.   The City could change the way it regulates "grandfathered" properties. So-called grandfathered properties at some point in the past, though not necessarily at present, have had impervious cover. Such properties may be "grandfathered" thereby requiring much less flood mitigation. The City could eliminate grandfathering so that all properties, where appropriate, require mitigation—including onsite detention.

119.   The City could adopt a strategy embraced by many floodplain managers called "No Adverse Impacts." City engineers would ensure that development projects would have "no adverse impacts" on surrounding properties.

## SOLUTIONS TO PROTECT RESIDENTIAL AREAS, SUCH AS DETENTION BASINS, HAVE BEEN POSTPONED.

120.   Defendants know solutions to the flooding problem for the residential areas.

121.   Solutions appeared in the engineering studies; they have appeared in CIPs or other public TIRZ documents; and they appeared in an early contract. But they have not been built.

122.   As early as 2003, a tri-party Contract among TIRZ 17, the City of Houston and the Memorial City Redevelopment Authority provided for certain drainage projects, including detention. This so-called Public Improvement Development Contract had a seven-year term which could be extended by mutual agreement of the parties and the approval by the City Council of Houston and the Authority's Board of Directors.

123.    The Contract provided for the implementation of projects by the Authority which had been approved in the Project Plan and the Financing Plan adopted by the City on August 11, 1999. Five drainage improvement projects, all of which had detention as their primary function, were identified.

124.    The existence of the Contract demonstrates that the Defendants knew that substantial detention—multiple projects both north and south of I-10—is required as a regional drainage solution.

125.    Some Plaintiffs recall that the TIRZ 17 developers hosted parties for the public at their buildings and area schools, showing model displays of the Contract's projects, such as green grass and pools of water indicating where the detention ponds were to be built.

126.    When these projects were not implemented, Plaintiffs felt deceived.

127.    To date, one detention pond, north of I-10 (on W140-01), has been constructed.

128.    However, until the W-140 channel improvements and "straws" are constructed (something else that has appeared in public TIRZ studies and other documents), this detention pond provides no benefit to the upstream neighborhoods.

129.    When the W-140 project was presented to the Authority and TIRZ Board in early 2014, the engineers stated that both phases could be completed by April 15, 2016. Instead, the Board members postponed these projects, so instead of being completed and functioning before the Tax Day flood of 2016, both projects are not even through the design states. The Authority and TIRZ have long been told by its engineers that completion of these two projects will greatly reduce the risk of flooding for 118 structures in the northside neighborhoods.

130.    Plaintiffs cannot understand why, after thirteen years, the substantial detention proposed in the City-Authority-TIRZ contract has still not been built.

131.    RAF members recall the former chair of the TIRZ 17 Board, Charles Turet, infamously telling them: "We have no money for detention."

132.    But TIRZ 17 has had plenty of money to prioritize projects benefiting the private commercial properties.

**WHILE DEFERRING DRAINAGE PROJECTS FOR RESIDENTIAL AREAS, DEFENDANTS INSTEAD EXPEND FUNDS ON NON-ESSENTIAL AND BEAUTIFICATION PROJECTS BENEFITING PRIVATE DEVELOPERS.**

133.    Defendants continue to prioritize non-essential projects, including one that supports a developer's beautification efforts, over projects that would provide flood relief to residential areas.

134.    For example, a private developer, Lipex Properties, L.P., a subsidiary of MetroNational, is constructing a new building next to the large concrete Conrad Sauer detention pond. This developer persuaded the TIRZ to reimburse it for the full $23 million cost of a beautification and roadway project with little to no public benefit.

135.    Lipex/MetroNational will convert the concrete detention basin next to its new development into a wet bottom basin, with planted terraced sides. This entails adding approximately five acre-feet of fill along the sides of the pond to plant landscaping. Lipex/MetroNational will add land to compensate for that detention removed from the pond.

136.    Lipex will add 12.6 acre-feet of new detention under a new section of Mathewson Road; however, the reimbursement contract with the Authority, which was approved by a City official, explicitly reserves this new detention for Lipex's exclusive use.

137.    In short, for a $23 million cost to the public, the public obtains barely any (if any) new detention, TIRZ 17 beautifies an existing concrete detention basin next to Lipex's property, and, most egregiously, even pays for Lipex's own private detention.

138.    This is an example of how commercial developers within TIRZ 17 exploit the public purse of the TIRZ to benefit its own projects and its own coffers.

139.    Shockingly, TIRZ 17 has prioritized the beautification of the Conrad Sauer detention pond, diverting $23 million to this project, over projects that could alleviate

neighborhood flooding.

140.    This $23 million could be used to provide much needed additional detention to the residential areas, instead of landscaping for Lipex. For example, a large apartment complex became available for purchase (south of Westview between Gessner and Conrad-Sauer), which could have been used to construct a 65 acre-foot detention facility for an estimated cost of $25 million. Defendants did not pursue it.

141.    Plaintiff RAF was unable to obtain documentation about this new Conrad Sauer project because TIRZ 17 claims it is a private project, even though they are using approximately $23 million of TIRZ 17 funds. TIRZ 17 claimed that the requested documents would only be released when Lipex/MetroNational completed their work.

142.    As another example, TIRZ 17 expended public money to submit a Letter of Map Revision ("LOMR") to FEMA that removed a portion of mapped floodplain from the property of a private developer at the corner of Wisterwood Drive and I-10. The developer was subsequently allowed to bring in fill material to elevate the site for new apartments without mitigation because it was no longer in the floodplain.

143.    In short, TIRZ 17 is using vast tax dollars for projects that are not of "general benefit to the municipality." *See* TEX. TAX CODE § 311.004.

144.    Additionally, TIRZ 17 has expended significant funds on various streetscaping projects designed to simply beautify the streets. On information and belief, more than $200,000 was spent per post, on certain individual lighting posts.

145.    The purpose behind the TIRZ is to give the tax revenue from a blighted area to local decision-makers so that they can fix the blight themselves. Eventually, the local area is improved, attracting new development, the tax base increases, and the TIRZ is dissolved so that

the tax revenue returns to benefit the entire city.

146.   This projected course of action is not happening with TIRZ 17. The tax base has increased far above projections, and TIRZ 17, which appears captured by the private developers, is unduly profiting by the increased tax base, to the detriment of the public residential areas around it.

147.   It is arbitrary government action for the City to approve TIRZ 17 expenditure of funds on beautification and other non-essential projects when the public surrounding TIRZ 17, the residential areas, so desperately need flood relief from problems created by development within the TIRZ.

**THE FORESEEABLE RESULT OF ALL THESE ACTIONS IS THAT HOMES OUTSIDE THE TIRZ 17 AREA SUFFERED REPEATED FLOODING: IN APRIL 2009, MAY 2015, AND APRIL 2016.**

148.   Since the inception of TIRZ 17, residential homes, which did not used to flood, now flood.

149.   During rainfall events in April 2009, May 2015, and April 2016, Plaintiffs' residential properties and homes in the neighborhoods north and south of TIRZ 17 experienced extensive flooding.

150.   Specifically, on April 27th and 28th, 2009, a major storm event occurred in the northwestern portion of Harris County. The largest rainfall accumulation recorded was 11.30 inches over the 24-hour period from 3:00 PM on April 27th until 3:00 PM on April 28th.  This amount of rain is less than the 100-year rainfall for this area, which is about thirteen inches in 24 hours according to the HCFCD.

151.   Although some labeled the 2009 event as "unprecedented", it was not unforeseeable. The Houston region is accustomed to heavy rainfall, and heavy rains are foreseeable. Engineers understand how to design infrastructure for heavy rains and to prevent

property damage. Drainage engineers routinely design flood control projects in Harris County to handle 100-year storm events.

152.    Six years later, another rainfall event hit the Houston area on May 25, 2015, the Memorial Day flood. Rain gauges in the Memorial area recorded 100-year rainfall levels over two, three and six hour periods (7, 8.3 and 10.1 inches respectively), and 50-year levels over a twelve-hour period (10.2 inches).

153.    Again, extensive flooding of properties and homes in the residential neighborhoods north and south of TIRZ 17 occurred. Numerous homes flooded.

154.    In many areas, the 2009 extent of flooding repeated in 2015. In other parts of the neighborhoods, homes that had not flooded in 2009 did flood during this 2015 event.

155.    Like the 2009 event, the 2015 event was close to the 100-year flood event and therefore entirely foreseeable.

156.    The most recent flood occurred just one year later, on April 18–19, 2016, the Tax Day flood.

157.    Many homes in the Memorial City area flooded during the eight inch rain (albeit fewer than in 2015).

158.    Plaintiffs live in and adjacent to the areas that were identified in the engineering studies, available to and known by Defendants, as flood prone. As predicted, these areas do flood, and will continue to flood in the absence of infrastructure improvements or flood prevention projects.

**DEFENDANTS IGNORED PLAINTIFFS' AND OTHER RESIDENTS' REPEATED REQUESTS AND COMPLAINTS.**

159.    The neighborhoods have repeatedly and vocally expressed concern that projects undertaken by or on approval of Defendants were making their flooding problems worse. Over

the past several years, the neighborhoods wrote letters and alerted the TIRZ 17 Board, Houston City Council, its Planning Commission, and its Flood and Drainage Committee of these problems.

160.    As examples, Plaintiffs and others spoke at many City Council meetings, including but not limited to the following dates: December 18, 2007; August 2, 2011; August 16, 2011; October 23, 2012; November 6, 2012; September 1, 2015; October 13, 2015; and March 1, 2016. On these and other occasions, Plaintiffs (or RAF representatives) had one-on-one conversations with council members or with members of the City's PW&E department.

161.    Plaintiffs and their representatives spoke to City Council Members, warning that new bridge openings were undersized, enlarged storm sewers and culverts were emptying into areas unsuited for that amount of additional water, commercial properties were draining onto their land, overland drainage needed to be improved, and that there was a lack of detention to handle all of the excess stormwaters.

162.    Public officials from HCFCD, Texas Department of Transportation, and the City of Houston repeatedly referred residents back to the TIRZ 17/Authority Board—an unelected Board primarily representing the interests of area developers, who have postponed projects benefiting the residential areas, and who have otherwise ignored public comments.

163.    The head of RAF, Ed Browne, has attended monthly TIRZ 17 board meetings since approximately 2004. Plaintiffs Lois Meyers and Virginia Gregory have attended many TIRZ meetings, specifically complaining about the flooding in their neighborhoods and asking why detention was not being built.

164.    Members of RAF have repeatedly advocated for flood relief, including the construction of detention basins, but consistently have been met with resistance.

165.     Recently, RAF pointed out that detention could be located near the Spring Branch bus depot, at the confluence of W140 & 153. But MetroNational appears poised to purchase the property for its own development.

166.     As another example, RAF once brought to TIRZ 17's attention that detention could be located just south of Memorial and west of Gessner where there is an open tract; however, a developer sitting on the TIRZ Board bought the property and is redeveloping it as high density housing.

167.     Due not only to the engineering studies but also to advocacy of Plaintiffs, Defendants know the Plaintiffs have drainage problems, that those problems have worsened over time due to Defendants' actions, and that regional flood relief is a critical component of any solution.

168.     To add insult to injury, the City now collects an annual drainage fee from properties throughout the City, including homeowners in the Memorial City Area, based upon the extent of impervious cover at each property. Residents in the north- and southside neighborhoods pay this fee to the City, but, to date, no "ReBuild Houston" drainage or road project is planned for these neighborhoods.

169.     It appears that, because the TIRZ exists, the City is unwilling to use the drainage fee it collects to address well-known drainage problems in these neighborhoods that have flooded three times. There are no City drainage projects in or near the TIRZ.

## THE PRESENT NEED FOR THIS LAWSUIT.

170.     The Plaintiffs have attempted to use the political process, advocating before City Council and the TIRZ, but did not achieve results.

171.     Plaintiffs do not object that actual "blight" within TIRZ 17 should be improved,

but it cannot come at the cost of transferring that blight to them.

172.   Plaintiffs understand that, recently, TIRZ 17 has boasted about planned detention in the current CIP. But Plaintiffs no longer trust Defendants to follow through on promises, or to implement adequate flood protection measures on their behalf, or to do so in a timely manner.

173.   The City recently refused to approve a Capital Improvement Plan (CIP) that did not improve drainage north of I-10, and asked that the Authority and TIRZ 17 complete the "straws" project and the 140 channel improvements simultaneously, instead of phased over three to four years. But, once again, Plaintiffs no longer trust that the Authority and TIRZ 17 will implement these drainage projects in a timely manner, as flood relief has been repeatedly promised and repeatedly postponed before.

174.   This lawsuit is about cementing promises that have been made and never honored.

175.   Plaintiffs are further concerned because the forthcoming 2017 TIRZ budget will include a proposal by the TIRZ 17 to extend the TIRZ 17 life by twenty years, and fear that the interests of the TIRZ do not promote "the public's common good and general welfare."

176.   An injunction is necessary because there is no adequate remedy at law, and because after all of the harm to Plaintiffs, the equities balance in the Plaintiffs' favor.

177.   Unless the Defendants are compelled to immediately allocate funds to flood protection of Plaintiffs' homes, their homes will continue to experience devastating flooding.

## V.     STANDING

178.   RAF has associational standing on behalf of its members. RAF's members, board members, and supporters reside in and own property throughout the Memorial City Area, including the Spring Branch north-side neighborhoods, and the south-side neighborhoods including Fonn Villas, Long Meadows, Memorial Pines, and Frostwood. One or more of RAF's

members has standing to sue in their own right. This litigation is germane to RAF's mission and purpose to advocate for flood relief.   RAF has advocated tirelessly for its members at Defendants' open meetings and in other forums, alerting Defendants to the flooding problems suffered by the Plaintiffs.

179.   Plaintiff Lois Meyers lives in the 9700 block of Westview, a few blocks north of the TIRZ. She first flooded in 2009, again in 2015, and partially in 2016. She brought her flooding problems to the attention of the City and the TIRZ multiple times. Plaintiff's injuries would be redressed if the proposed W-140 improvements and other drainage projects are constructed.

180.   Plaintiff Virginia Gregory lives in the 9800 block of Westview, a few blocks north of the TIRZ. She first flooded in 2009, again in 2015, and again in 2016. She brought her flooding problems to the attention of the City and the TIRZ multiple times. Plaintiff's injuries would be redressed if the proposed W-140 improvements and other drainage projects are constructed.

181.   Plaintiff Bayan Raji lives in the 10000 block of Cedardale, and previously lived at in the 10000 block of Larston, which she still owns. Both homes are a few blocks north of the TIRZ. She moved in late 2009, and flooded in 2015 and 2016. Plaintiff's injuries would be redressed if proposed W-140 improvements and other drainage projects are constructed.

182.   Plaintiff Lee Martin lives in the 12400 block of Cobblestone, south of the TIRZ in the Frostwood neighborhood. He flooded in 2009, 2015, and 2016. Plaintiff's injuries would be redressed if proposed TIRZ drainage projects and others are constructed.

183.   Plaintiff Anita Giezentanner lives on Tallowood near Memorial, south of the TIRZ and close to Channel W-153. She flooded in 2009 and 2015, and was impacted by the

City's Attingham and Fonn Villas drainage projects, which convey their water into W-153. Plaintiff's injuries would be redressed if the proposed TIRZ drainage projects and others are constructed.

184.   Plaintiffs' injuries are caused by actions and inactions of Defendants.

185.   In addition to the injury of damaged property, these Plaintiffs live in a constant state of anxiety each and every time it rains. Some Plaintiffs fear travelling too far from their homes just so that they can rush home if heavy rains come. Some Plaintiffs must be home and watchful every time it rains so that they can be ready to save personal possessions if the floodwaters begin to rise.

## VI.   CAUSES OF ACTION

### CAUSE OF ACTION NO. 1
### VIOLATION OF FOURTEENTH AMENDMENT
### SUBSTANTIVE DUE PROCESS, UNDER 42 U.S.C. § 1983

186.   The paragraphs above are incorporated by reference.

187.   42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation . . . subjects, or cause to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress[.]"

188.   The Due Process Clause of the Fourteenth Amendment—which prohibits depriving any person of life, liberty, or property, without due process of law—is intended to prevent government from abusing its power.

189.   Substantive due process bars arbitrary government actions regardless of the fairness of the procedures used to implement them.

190.    Plaintiffs have been deprived of a constitutionally protected right, specifically their property rights, because Defendants have interfered with Plaintiffs' use of their homes.

191.    Defendants have acted arbitrarily and abused their power in their actions and inactions that cause flooding and damage of Plaintiffs' properties.

192.    Defendants have acted arbitrarily in effectively transferring the TIRZ 17 "blight" and flooding problems to Plaintiffs.

193.    Defendants act arbitrarily is consistently postponing flood protection for Plaintiffs, knowing that Plaintiffs do flood, will flood in the future, and need relief.

194.    Defendants act arbitrarily in prioritizing the private commercial interests over the residential interests, approving various non-essential projects, such as "beautification" projects for TIRZ developers, when solutions exist to help Plaintiffs and Plaintiffs are in such desperate need for flood relief.

195.    Defendants act arbitrarily in failing to build flood protection for Plaintiffs or failing to require mitigation (such as detention) to protect Plaintiffs' homes before sending floodwaters into them, and causing significant property damage to thousands of flooded residential homes.

196.    The Defendants' decisions and actions and inactions lack a rational basis.

197.    The pattern of decisions and actions by Defendants shocks the conscience.

198.    Further, a subset of substantive due process is the "state-created danger" theory. For the state-created-danger theory to apply, the state actors must have created a dangerous environment that they knew to be dangerous and their use of authority created an opportunity that would not otherwise have existed.

199.     Plaintiffs also allege that Defendants have created a dangerous environment for the residential neighborhoods adjacent to TIRZ 17 under a state-created danger theory.

200.     Multiple studies, as well as repeated in-person advocacy by Plaintiffs and other residential homeowners, have put Defendants on actual notice that Plaintiffs are victims of Defendants' actions.

**CAUSE OF ACTION NO. 2**
**VIOLATION OF TEXAS CONSTITUTION ART. 1 § 19, DUE COURSE OF LAW**

201.     The paragraphs above are incorporated by reference.

202.     According to the Texas Supreme Court, "The protection of one's right to own property is said to be one of the most important purposes of government." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977).

203.     Article I, section 19, of the Texas Constitution explains that no citizen of this state shall be deprived of his property except by the due course of the law of the land. The due course that protects citizens requires not only procedural but also substantive due course.

204.     Plaintiffs have been deprived of a constitutionally protected right, specifically their property rights, because Defendants have interfered with Plaintiffs' use of their homes. Plaintiffs homes have served as detention ponds during rain events over the past seven years.

205.     Plaintiffs allege that the Defendants' actions causing flooding has deprived them of property rights without due course of law, in violation of Article I, Section 19 of the Texas Constitution.

206.     Defendants have acted arbitrarily in effectively transferring the TIRZ 17 "blight" and flooding problems to Plaintiffs.

207.     Defendants have acted to favor private commercial interests within TIRZ 17 at the expense of causing and contributing to flooding of their homes.

208.    Defendants act arbitrarily in failing to build flood protection for Plaintiffs or failing to require mitigation (such as detention) to protect Plaintiffs' homes before sending floodwaters into them, and causing significant property damage to thousands of flooded residential homes.

209.    Plaintiffs allege that public funds are being used for private benefit.

## CAUSE OF ACTION NO. 3
## VIOLATION OF FOURTH AMENDMENT FOR
## UNREASONABLE SEIZURE OF PROPERTY, UNDER § 1983

210.    The paragraphs above are incorporated by reference.

211.    42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation . . . subjects, or cause to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress[.]"

212.    The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

213.    A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

214.    The Fourth Amendment applies to civil as well as criminal seizures, and it applies to real property.

215.    A seizure may occur when personal property has been destroyed or devalued by state action.  Unconstitutional seizures may occur when a party's land or physical property is the subject of actual damage or destruction.

216.    Flooding of Plaintiffs' homes caused by Defendants is a seizure for purposes of the Fourth Amendment. When floodwater enters Plaintiffs' homes, they are deprived of the use of their property. At times, Plaintiffs must evacuate, repair, and rebuild their homes, during which time they cannot fully use their own homes.

217.    Defendants have seized and will continue to seize Plaintiffs' land and homes without a health and safety or nuisance justification, depriving them of possessory interests.

218.    Defendants' seizure of Plaintiffs' property is unreasonable.

**CAUSE OF ACTION NO. 4**
**DECLARATORY JUDGMENT FOR STATE AND**
**FEDERAL CONSTITUTIONAL VIOLATIONS**

219.    The paragraphs above are incorporated by reference.

220.    The Federal Declaratory Judgment Act provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such." 28 U.S.C. § 2201(a).

221.    The Act further provides that ""[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2002.

222.    The Texas Uniform Declaratory Judgment Act, TEX. CIV. PRAC. & REM. CODE § 37.001 et seq., is a remedial statute designed "to settle and to afford relief from uncertainty and

insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b).

223. As described below, Plaintiffs request declaratory and injunctive relief for the constitutional violations.

## VII.   RELIEF REQUESTED

Plaintiffs respectfully request that this Court grant the following relief:

A.   Declare that Defendants have violated Plaintiffs' federal constitutional rights under the 14th amendment.

B.   Declare that Defendants have violated Plaintiffs' federal constitutional rights under the 4th amendment.

C.   Declare that Defendants have violated Plaintiffs' state constitutional rights under the due course of law provision, Article I, section 19, of the Texas Constitution.

D.   Order Defendants to expeditiously implement recommendations of the 2014 Amendment to the LAN Regional Drainage Study including projects (i) north of I-10, improvements to 140 channel and straws, and (ii) south of I-10, two detention ponds and improved box culverts throughout the region.

E.   Order Defendants to expeditiously construct other necessary drainage projects that are not listed on the LAN Study, to address the existing and known flooding problems in the north and south neighborhoods—the development of such projects to be overseen by a Special Master appointed by the Court.

F.   Enjoin Defendants and their employees and agents from any further expenditures of TIRZ 17 funds to Lipex Properties LLC, under the private development agreement, until such

time as the residential areas have adequate drainage infrastructure improvements, such as detention ponds and inline detention.

G.     Enjoin Defendants TIRZ 17 and the Authority from executing other private development agreements, until such time as the residential areas have adequate drainage infrastructure improvements.

H.     Enjoin Defendant the City of Houston from approving new commercial building permits on lots greater than five acres inside the boundaries of TIRZ 17, until such time as this Court or the Special Master makes a finding that the development does not increase flooding risks in the residential neighborhoods.

I.     Appoint a Special Master to oversee the expenditure of TIRZ 17 funds, so that they are used to advance flood protection projects aiding the Plaintiffs and residential areas, and to oversee the development of drainage projects for the neighborhoods.

J.     Maintain jurisdiction and oversight over this matter until this Court and/or the Special Master is satisfied that Plaintiffs' homes will receive adequate flood protection.

K.     Award Plaintiffs their costs, reasonable attorneys' fees, and expert fees.

L.     Award such other relief as this Court deems just and appropriate.

## VIII.   PRAYER

Plaintiffs request that upon a final hearing hereof this Court order declaratory and injunctive relief, and for other and further relief to which Plaintiffs may show itself justly entitled, including attorneys' fees.

RESPECTFULLY SUBMITTED BY:

 /s/ Charles W. Irvine
CHARLES W. IRVINE
*Attorney in Charge*
Southern District of Texas Bar No. 675029
TBN. 24055716
MARY B. CONNER
Southern District of Texas Bar No. 1093200
MICHAEL P. MCEVILLY
Southern District of Texas Bar No. 2218880
Irvine & Conner, PLLC
4709 Austin Street
Houston, Texas 77004
713–533–1704
charles@irvineconner.com

**Counsel for Plaintiffs**